UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY; ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY; and ASMI AUTO INSURANCE COMPANY, | C.A. No. _____ |
| Plaintiffs, | |
| v. | **Demand for Jury Trial** |
| AYMAN TARABISHY, M.D., PLLC and AYMAN TARABISHY, M.D., | |
| Defendants. | |

## COMPLAINT

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and ASMI Auto Insurance Company (hereinafter, "Allstate" and/or "plaintiffs") hereby allege as follows.

## I.   INTRODUCTION

1.     This is a case about a medical clinic and its owner who abused the medical benefits available under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., by engaging in a scheme to defraud Allstate by submitting false and fraudulent records, bills, and invoices through interstate wires and the U.S. Mail

1

seeking to collect payment from Allstate for treatment and services that were not actually performed, were medically unnecessary, were fraudulently billed, and were not lawfully rendered pursuant to applicable statutes and regulations, including the Michigan No-Fault Act.

2.     Defendants Ayman Tarabishy, M.D., PLLC d/b/a Enhance Center for Interventional Spine & Sports ("Enhance Center") and Ayman Tarabishy, M.D. ("Tarabishy") (collectively, the "defendants") each conspired to, and did in fact, defraud Allstate by perpetuating an insurance fraud scheme in violation of federal and state law.

3.     The insurance fraud scheme was designed to, and did in fact, result in payments from Allstate to and on behalf of the defendants pursuant to Michigan's No-Fault Act.

4.     All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

5.     By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment. Allstate also seeks declaratory relief that no previously-denied and pending claims submitted to it by the defendants are compensable.

6.     As a result of the defendants' fraudulent acts, Allstate has paid in excess of $452,275 to them related to the patients at issue in this Complaint.

## II.   THE PARTIES

### A.   PLAINTIFFS

7.     Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and ASMI Auto Insurance Company are each companies duly organized and existing under the laws of the State of Illinois.

8.     Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and ASMI Auto Insurance Company each have their respective principal places of business in Northbrook, Illinois.

9.     At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

### B.   DEFENDANTS

#### 1.   Ayman Tarabishy, M.D., PLLC

10.     Defendant Ayman Tarabishy, M.D., PLLC is a professional limited liability company organized under the laws of the State of Michigan.

11.     Ayman Tarabishy, M.D., PLLC uses the registered fictitious name Enhance Center for Interventional Spine & Sports.

3

12.     Enhance Center's member is Tarabishy, who is a citizen of the State of Michigan.

13.     At all relevant times, Enhance Center was operated and conducted by defendant Tarabishy.

14.     Enhance Center billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and that were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 1.

### 2.     **Ayman Tarabishy, M.D.**

15.     Defendant Tarabishy is a resident and citizen of the State of Michigan.

16.     At all times relevant to this Complaint, Tarabishy owned and controlled defendant Enhance Center.

17.     At all times relevant to this Complaint, Tarabishy operated and conducted defendant Enhance Center.

### III.   **JURISDICTION AND VENUE**

18.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action on the basis of the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq*., because they arise under the laws of the United States.

19.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

20.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

21.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.   <u>BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME</u>

22.     The defendants submitted exorbitant charges to Allstate for purported medical services, testing, and procedures that were not actually provided, were not medically necessary, and were fraudulently billed.

23.     The purpose of the scheme was to generate the highest possible amount of charges to Allstate to abuse the Michigan No-Fault Act.

24.     Enhance Center is a pain management clinic that was used to generate billing based on exaggerated, unsupported, and falsified findings with respect to patients who claimed to be involved in motor vehicle accidents by implementing a predetermined treatment protocol.

25.     The defendants' predetermined treatment protocol included frequent, excessive, and unnecessary office visits during which the defendants made non-

specific and unsupported diagnoses to create the appearance of significant injuries and necessity for treatment billed to Allstate.

26.     The defendants used their treatment protocol to falsely diagnose nearly every patient that reported to Enhance Center with a similar collection of purported vague "injuries."

27.     Enhance Center and Tarabishy used the diagnoses of these non-specific injuries to create the appearance of justification for extensive testing and treatment that was not supported or necessary, including electrodiagnostic testing, urine drug testing, and numerous diagnostic and therapeutic injections.

28.     The defendants used frequent and unnecessary re-evaluations to pressure patients to undergo additional unnecessary testing and treatment, such as additional injections.

29.     The defendants pressured patients to submit to their predetermined treatment protocol regardless of the patients' actual conditions, including when the treatment was not helping patients and when such treatment was actually harmful.

30.     As part of their treatment protocol, the defendants also used the frequent re-evaluations to order ongoing physical therapy and chiropractic treatment for patients.

31.    Many of the patients at issue in this action were directed to the defendants for treatment by chiropractic and physical therapy clinics that have a history of involvement in illegally soliciting auto accident victims.

32.    Thus, the defendants had an additional incentive to continue diagnosing patients with injuries and to order ongoing physical therapy and chiropractic treatment for every patient to ensure they continued receiving referrals of illegally solicited patients from those other providers.

33.    As evidence of this improper motivation for the defendants' treatment recommendations for patients, examination reports prepared by the defendants frequently included claims both that chiropractic and physical therapy was resulting in gradual improvement in patients' conditions, which the defendants used to justify continuing to prescribe such treatment, **and** that these conservative treatments were unsuccessful, which the defendants used to justify ordering the more invasive treatments they billed Allstate for, such as injections.

34.    After pressuring patients to undergo medically unnecessary treatments, if treatments were performed at all, the defendants further inflated Enhance Center's bills by fraudulently unbundling and upcoding charges.

35.    Defendant Tarabishy has testified that billing for Enhance Center was developed by David Winter ("Winter"), a consultant from Florida who has a lengthy

history of manipulating bills in Michigan to take advantage of the medical insurance benefits provided by the No-Fault Act.

36.    Indeed, Winter was charged with ten (10) felony counts in the State of Michigan relating to healthcare fraud and billing for medical services and devices that were never rendered.

37.    As a result of their relationship and shared control, the defendants and their associates had a significant financial motivation to bill Allstate for as many services, testing, procedures, and medications as possible, all at unconscionable rates and regardless of medical need and applicable standards of care.

38.    Enhance Center's bills and associated records were sent to Allstate through interstate wires and the U.S. Mail, and Allstate relied on the faxes and mailings sent by the defendants in adjusting and paying insurance claims.

## V.    BILLING FOR SERVICES NOT RENDERED

39.    The defendants regularly submitted bills to Allstate seeking payment for treatment and services that were never rendered to patients at issue herein.

40.    The defendants' pervasive pattern of faxing and mailing demands for payment for services that were not rendered is indicative of their goal to submit as many bills for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

41.     All of the bills submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking payment for treatment that never occurred are fraudulent.

42.     Allstate is not required to pay the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants as a result of their fraudulent billing for services not rendered.

### A.     ENHANCE CENTER BILLED FOR PROCEDURES AND INJECTIONS NOT PERFORMED

43.     The bills and invoices submitted to Allstate by the defendants contained Current Procedural Terminology (CPT) codes that were intended to identify the procedure or medical service allegedly provided by the defendants.

44.     CPT codes are published by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.  Providers subject to the Health Insurance Portability and Accountability Act are required to use CPT codes when submitting bills.

45.     Enhance Center frequently billed Allstate using CPT codes for injections and surgical procedures that were not performed.

46.     One way Enhance Center accomplished this was by billing Allstate for an injection that may actually have been administered, and then adding additional charges for injections that did not occur.

47.     As one example of this, Enhance Center billed $5,000 for a lumbar platelet rich plasma ("PRP") injection to patient A.S. (Claim No. 0564155588)[1] on January 15, 2021 and also billed an additional $3,700 using CPT code 64493 and $1,900 using CPT code 64494, which are billing codes for lumbar facet joint injections.

48.     However, only a PRP injection at two vertebral levels was done and the separate bilateral facet joint injections also billed by Enhance Center with respect to patient A.S. did not occur.

49.     The defendants also billed for injecting more spinal levels than were actually treated, if injections were done at all.

50.     For example, on August 14, 2018 and August 28, 2018, Enhance Center billed for alleged three-level facet injections to R.C. (Claim No. 0497914762).

---

[1] To protect the confidentiality of the patients at issue herein, Allstate refers to them by initials and Allstate claim number.  The defendants are aware of the Allstate claim number, as the defendants included the claim number on the bills they submitted to Allstate.

51.    A facet joint is located in the space between the bones of the spinal column, such that a two (2) level facet joint injection involves three (3) vertebral levels.

52.    R.C. underwent injections at levels C2 to C4, which consists of two injections to the facet joints between C2 and C3 and between C3 and C4.

53.    Despite this, Enhance Center billed Allstate for a third level of facet injection that was not done.

54.    Another way the defendants billed for services that were not actually rendered was by billing for epidurograms that were allegedly used to guide needle placement for epidural steroid injections ("ESI").

55.    Epidurograms are diagnostic procedures that involve the injection of dye to detect dispersion within the injected space, allowing for visualization of anomalies, and are used to aid a physician in identifying spinal pain that may be missed by other diagnostic imaging methods.

56.    Coding guidelines for epidurograms require, among other things, the preparation of a formal radiologic report separate from the injection procedure and permanent "hardcopy" images in multiple planes of the specific anatomic region.

57.    Medical billing guidelines for epidurograms expressly instruct that an injection of contrast during an image guided epidural steroid injection is not an epidurogram, meaning that the billing submitted by the defendants for the

performance of an epidurogram during an injection procedure was for a procedure that did not occur.

58.　　The defendants frequently billed for epidurograms but did not satisfy any of the requirements to bill for such a procedure.

59.　　As an example of this practice, Enhance Center billed Allstate for a lumbar ESI to patient G.L. (Claim No. 0413800657) on January 30, 2017, and also billed Allstate for an epidurogram.

60.　　The report prepared for the procedure states only that the injection was performed under fluoroscopic guidance, and then states that G.L. was injected with a contrast material, which is exactly the procedure that billing guidelines are clear is not an epidurogram.

61.　　No separate radiologic report was prepared for the alleged epidurogram on patient G.L., nor were copies of the required imaging maintained as required to bill for performing an epidurogram.

62.　　The defendants' actions of billing for injections and related medical procedures that were not actually rendered were fraudulent and constitute billing for services not rendered.

### B.　THE DEFENDANTS BILLED FOR TESTING THAT WAS NOT PERFORMED

63.　　The defendants also billed Allstate for testing that did not actually occur.

64.    For example, Enhance Center frequently billed Allstate for presumptive urine drug testing that did not occur.

65.    Since May 2018, Enhance Center has billed Allstate at least 53 times for presumptive drug testing at the time of patient evaluations, charging $450 on each occasion even though this testing was not done.

66.    As one example of Enhance Center's practice of billing for drug testing that did not occur, it billed Allstate for two (2) urine drug tests in relation to patient D.W. (Claim No. 0468863261) on May 22, 2018 and December 11, 2018.

67.    The evaluation reports for D.W.'s visits on those dates make no reference to any drug testing being ordered or performed and the records submitted to Allstate by Enhance Center with respect to its billing for those dates include no results of any such testing, confirming that these urine drug tests did not actually occur.

68.    The defendants' actions of billing for urine drug testing and other types of testing that did not occur were fraudulent and constitute billing for services not rendered.

### C.    THE DEFENDANTS BILLED FOR PATIENT EVALUATIONS THAT DID NOT OCCUR

69.    Enhance Center and Tarabishy also regularly billed Allstate for patient evaluations that did not actually occur.

70.    One way the defendants did this is by copying previous patient evaluation reports to make it appear that a re-evaluation had occurred when it did not.

71.    For example, Enhance Center billed for a re-evaluation of patient A.S. (Claim No. 0564155588) on October 2, 2020 that did not occur, which is evidenced by the report prepared for that date, which was simply copied from a previous alleged examination on August 10, 2020.

72.    The October 2, 2020 report repeats verbatim the section of an August 10, 2020 recording A.S.'s alleged complaints on that day, and even copies the August 10, 2020 date from the earlier report.

73.    The section of the report describing A.S.'s alleged physical examination by Enhance Center that day also is copied from the August 10, 2020 report and includes the same typographical and punctuation errors.

74.    As additional proof that the October 2, 2020 re-examination did not occur, between that date and the August 10, 2020 examination, the defendants billed for an alleged cervical ESI on August 27, 2020 and a lumbar ESI on September 2, 2020, yet the October 2, 2020 report does not mention those injections at all or discuss whether the injections were beneficial, and instead simply copies language from the August 10, 2020 report that "I . . . . did offer him a cervical interlaminar ESI to see if this might help with his pain."

75.     All of the bills submitted by Enhance Center and Tarabishy to Allstate seeking payment for examinations and testing of patients that did not actually occur are fraudulent.

76.     Allstate is not required to pay the defendants for examinations of patients at issue in this Complaint that did not take place and is entitled to recover any payments tendered to the defendants as a result of their fraudulent billing for services not rendered.

## VI.    <u>FALSIFIED MEDICAL RECORDS</u>

77.     The defendants created and submitted medical records that were altered, forged, and fabricated in an effort to conceal their fraud and to create the appearance of significant injury in order to justify their bills.

78.     Each of the reports created for patient examinations that did not actually occur, as described previously, were fabricated.

79.     In addition to preparing falsified reports for patient evaluations that did not occur at all, the defendants also utilized generic stock phrases and "cut and paste" language in patient evaluation reports that were included to attempt to create the appearance of necessity for the treatment and testing billed by the defendants.

80.     As discussed in detail herein, as part of their predetermined treatment protocol the defendants routinely, and improperly, diagnosed patients with lumbar

and/or cervical radiculopathies beginning at their initial evaluations at Enhance Center based only on patients' alleged subjective complaints.

81.    The defendants used these diagnoses to order additional testing and to justify recommendations that patients undergo injections, as whenever the defendants diagnosed a patient with radiculopathy, the reports invariably included similar stock language claiming that the patient was a "good candidate" for an epidural steroid injection.

82.    Evaluation reports also included other standard, cut-and-pasted language used to justify the defendants' billing.

83.    Almost every Enhance Center report includes the statement that "[t]oday I had a very long discussion with the patient regarding their pain condition as well as the different therapeutic modalities that could be available to them."

84.    The defendants included such language in their reports in an attempt to make the evaluations appear more thorough and complex than what actually occurred, in order to justify the amounts they billed Allstate for those examinations.

85.    The defendants included this type of stock language in their reports even when it was demonstrably untrue.

86.    For example, D.M. (Claim No. 0528789407) was allegedly evaluated by Tarabishy on May 18, 2020 via a tele-medicine appointment due to COVID-19 restrictions.

87.     This entire encounter – which allegedly included D.M. reporting on her current condition and complaints, the status of her physical therapy and home exercise regimens, and a discussion about medications she had been prescribed by her primary care physician – lasted just seven (7) minutes.

88.     Nevertheless, Tarabishy reported that "[t]oday I had a very long discussion with the patient regarding their pain condition as well as the different therapeutic modalities that could be available to them."

89.     It is not possible that Tarabishy had a "very long discussion" with a patient during a remote examination that lasted just seven (7) minutes.

90.     The inclusion of such language in the defendants' reports was false and was intended to mislead Allstate and induce it to pay monies to the defendants to which they were not entitled.

91.     Another way the defendants falsified reports was by altering patient diagnoses to fit the criteria for recommending new or additional treatment, despite identifying no changes in patients' conditions that would justify the changed diagnoses.

92.     As one example of this practice, between November 19, 2019 and January 15, 2021, Enhance Center repeatedly saw A.S. (Claim No. 0564155588), and continually diagnosed him with lumbar radiculopathy.

93.    Based on its diagnosis of lumbar radiculopathy, Enhance Center billed for a lumbar ESI on July 2, 2020, and, without ever evaluating the effectiveness of the first injection, again on September 2, 2020.

94.    Following these injections, Enhance Center continued to diagnose A.S. with lumbar radiculopathy and continued to recommend additional ESI "as needed," including at a re-evaluation on January 15, 2021.

95.    Despite the continued diagnosis of radiculopathy through January 15, 2021, that same day Enhance Center billed for an alleged bilateral platelet rich plasma injection at two lumbar levels, at which time Enhance Center suddenly changed A.S.'s diagnosis from lumbar radiculopathy to lumbar spondylosis, which describes an age-related degeneration of the vertebrae and disks of the lower back.

96.    The fabricated and altered documents created by the defendants were submitted to deceive Allstate into paying for treatment and services that were illegal, medically unnecessary, or not rendered at all.

97.    Testing, treatment, and services ordered and billed by the defendants that are based on falsified medical records and not on the patient's actual condition cannot be considered medically necessary.

98.    Allstate is not required to pay any of the defendants for treatment and services that were ordered pursuant to forged, altered, or falsified records, and it is

entitled to restitution of all amounts it paid to the defendants for medical services ordered on the basis of the defendants' falsified medical records and reports.

## VII.  UNLAWFUL SOLICITATION BY THE DEFENDANTS

### A.  MICHIGAN'S ANTI-SOLICITATION LAWS

99.  The solicitation and exploitation of motor vehicle accident victims for profit or professional gain is strictly prohibited in the State of Michigan, as is the use of factors other than legitimate medical judgment to bill insurers like Allstate.

100.  Michigan law prohibits "[a]ny physician or surgeon engaged in the practice of medicine in this state" from "employ[ing] any solicitor, capper, or drummer for the purpose of procuring patients."  Mich. Comp. Laws § 750.429.

101.  Other conduct prohibited under Michigan law ranges from the identification and solicitation of potential patients of medical providers, to the use of agents to solicit patients, and to the receipt of fees obtained through such fraudulent methods, including the mere participation in any schemes relating to such activity.  *See* Mich. Comp. Laws §§ 750.410b, 750.429, 257.503, and 500.4503(h)-(i).

102.  It is also illegal in Michigan to contact any motor vehicle accident victim to offer a service within thirty (30) days of the accident, Mich. Comp. Laws § 750.410b, and to use police reports to solicit any person identified in the report, Mich. Comp. Laws § 257.503(1)(a).

103.   Only "lawfully render[ed] treatment" is compensable under Michigan's No-Fault Act.  Mich. Comp. Laws § 500.3157(1).

104.   As set forth more fully below, the defendants participated in and willingly benefited from schemes to solicit patients through conduct prohibited under Michigan law.

### B.   IMPROPER AND UNLAWFUL METHODS USED TO SOLICIT PATIENTS

105.   Despite Michigan's prohibition on patient solicitation, the defendants employed a number of unlawful and improper methods to obtain patients.

106.   Much of the illegal solicitation of patients was performed by or on behalf of the defendants' personal injury attorney associates who referred such solicited patients to the defendants as part of a *quid pro quo* arrangement to generate bills for No-Fault payments and thereby increase the value of claims against Allstate.

107.   In exchange for referrals from personal injury attorneys, the defendants ordered, referred, and billed for extensive medically unnecessary treatment that was designed only to maximize the amount of charges submitted to Allstate and thereby increase the value of claims made both by the providers and by the personal injury attorneys.

108.   The defendants obtained patients through the illegal use of unapproved police reports that were procured by their associates and used to contact patients and

pressure them to begin treatment when they otherwise would not have and did not need treatment.

109.   Patients of the defendants have testified that they were solicited by law firms in the days following their auto accidents and then ultimately directed to the defendants.

110.   Patient Z.S. (Claim No. 0609059712), for example, testified that after he and a friend were allegedly involved in an accident they were contacted 48 hours later by an attorney that "wanted to see if I want to file a case" and who came to his friend's home and met with them.

111.   Z.S. testified that "I didn't even know who they was," that "I was unaware how they even knew we was in an accident," and that "[t]hey just called, said they was aware that me and Mr. [L] was in a car accident . . . .  I assumed it was, for better words, like what do you call them, ambulance chasers."

112.   According to Z.S., the attorney "started sending us to like treatments," and he was first sent to a chiropractor, then for MRIs, and "[t]hen once they got the MRIs back, then they referred me to a spine specialist," which was defendant Tarabishy.

113.   Many of the patients at issue in this Complaint who went to Enhance Center were referred by chiropractors who are associated with the previously discussed scheme to solicit patients.

114. For example, Tarabishy reported on January 7, 2020 that T.H. (Claim No. 0545599333) was referred to him by chiropractor Summer Fakhouri.

115. Fakhouri is one of the chiropractors that were involved in the scheme to solicit auto accident victims and direct them to unnecessary and excessive medical treatment.

116. The unlawful solicitation and unqualified referral of patients to the defendants by laypersons was an improper non-medical factor that directly led to the unnecessary and fraudulent bills submitted to Allstate detailed herein.

117. The referral of alleged accident victims to the defendants bore no relation to the medical necessity of the patients at issue in this Complaint, who would not have sought treatment but for the unlawful solicitation and referrals.

118. The defendants enabled and participated in this system of solicitation and referrals in order to obtain patients on whom they could implement a predetermined treatment protocol as described herein in order to bill for excessive and medically unnecessary treatment designed to maximize the charges billed to Allstate under the No-Fault Act.

119. Accordingly, the defendants' treatment of the solicited patients constituted unlawful, unreasonable, and unnecessary services that is not payable under the No-Fault Act.

## VIII. UNREASONABLE AND UNNECESSARY FRAUDULENT TREATMENT

120. The defendants' willingness to bill for services that were never rendered or that were rendered unlawfully demonstrates their willingness to also bill for treatment that was unreasonable and unnecessary.

121. The defendants' goal was to bill for as much treatment as possible, regardless of whether such treatment was reasonably necessary to patients' care, recovery, rehabilitation, and/or arose out of an alleged motor vehicle accident, in order to generate bills to Allstate.

122. To maximize their financial gain, the defendants adhered to a predetermined protocol of unnecessary, indiscriminate, and excessive treatment and testing, as discussed more fully below.

123. The defendants' purported treatment violated standards of care in the medical community, as services were not indicated, redundant, excessive, and repeated without any benefit to patients.

124. The full extent and pattern of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they billed was not known to Allstate until it undertook the full investigation that culminated in the filing of this action.

125. The unnecessary treatment billed by the defendants, discussed more fully below, includes, but is not limited to, the treatment and patients set out in the chart annexed hereto at Exhibit 1.

126. All of the claims submitted by the defendants to Allstate through the U.S. Mail and interstate wires seeking payment for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

127. Allstate is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid as a result of the defendants' fraud.

128. None of the above facts were known to Allstate until it undertook its investigation that resulted in the commencement of this action, and are not evident within the four corners of the medical records and bills submitted to Allstate by the defendants.

## A. THE DEFENDANTS' PREDETERMINED TREATMENT PROTOCOL

129. The pattern of diagnoses and treatment implemented by the defendants with respect to motor vehicle accident patients was characterized by (1) routinely recording substantially similar generalized complaints of non-specific pain in patients' neck, back, and various joints and extremities, (2) making highly similar diagnoses across patients beginning at the patient's initial evaluation and continuing throughout frequent re-evaluations ordered by the defendants for each patient, (3)

ordering testing that was not actually used to guide patient treatment, (4) providing mirrored treatment plans that included recommendations for immediate resort to multiple diagnostic and therapeutic injections and procedures, prescriptions for multiple medications, and ongoing orders for physical therapy and chiropractic treatment solely to run up bills to Allstate, and (5) continuously recommending and pressuring patients to undergo additional injections and procedures, whether or not prior injections and procedures were beneficial.

130.   The defendants' treatment protocol began with an initial alleged evaluation at Enhance Center at which Tarabishy falsely reported pain even when patients were not injured.

131.   The defendants used patients' purported subjective complaints to diagnose numerous, similar conditions for each patient, including generic, vague pain diagnoses, and to routinely diagnose conditions such as cervical and lumbar radiculopathy that were not based on the performance of a neurologic examination identifying a focal neurologic deficit as is required to properly diagnose radiculopathy.

132.   The defendants' predetermined protocol and purported examinations did not include evaluations of patients' medical histories and comorbidities that could impact their treatment plans and lead to alterations of predetermined protocols.

133.    As part of their predetermined treatment protocol, the defendants also employed stock language and phrases in initial and follow up patient evaluation reports that were used to give the appearance of substantial injury and to justify follow-up examinations and future treatment.

134.    One example of the defendants' use of this type of stock language that was cut-and-pasted into reports was the statement that the patient was "a good candidate" for either a cervical or lumbar ESI any time patients allegedly reported any type of radiating pain or numbness in the extremities, even though such complaints are a common result of soft tissue injuries that usually will resolve without treatment.

135.    Based on these generic diagnoses of "injury," the defendants also routinely ordered numerous tests for each patient as part of their predetermined treatment protocol, typically including electromyography ("EMG"), nerve conduction studies ("NCS"), magnetic resonance imaging ("MRI"), and urine drug testing ("UDT").

136.    The purpose of testing ordered by the defendants was to generate additional billing, as testing was ordered whether or not it was clinically indicated, and was not used to guide patient treatment.

137.    The defendants also repeatedly recommended and billed for testing and invasive procedures even when patients were improving and when conservative

treatment such as physical therapy was helping, which is contrary to the standard of care.

138.    Demonstrating that testing ordered by the defendants served no medical purpose relevant to patients' course of treatment and was simply ordered as part of the defendants' predetermined protocol, the defendants frequently billed for procedures such as injections that were intended to treat conditions that the tests they ordered were supposed to diagnose <u>before</u> the testing took place, meaning there was no possible reason for such testing.

139.    As one example of this practice, Enhance Center already diagnosed patient A.S. (Claim No. 0564155588) with lumbar and cervical radiculopathy at his initial evaluation on November 18, 2019, and shortly thereafter recommended EMG and NCS testing of the upper and lower extremities, which are tests intended to make a clinical diagnosis of radiculopathy.

140.    Yet before the EMG and NCS testing occurred, if it actually occurred at all, Enhance Center billed for multiple lumbar and cervical ESI allegedly administered to A.S., which proves that the EMG and NCS testing was not actually intended to guide treatment recommendations for A.S. at all.

141.    As further confirmation that the EMG and NCS testing of A.S. was intended solely to generate additional billing and not to guide treatment, Enhance Center subsequently billed for EMG and NCS testing of A.S.'s upper extremities on

October, 21, 2020, even though A.S. was no longer complaining of radicular pain in the upper extremities and even though he had already allegedly undergone cervical ESI injections.

142. Unsurprisingly, that testing was completely normal, proving that A.S. did not have cervical radiculopathy.

143. Despite the results of the EMG and NCS, Enhance Center continued to diagnose A.S. with cervical radiculopathy and continued to recommend he receive repeated cervical ESI "as needed," including at the very next evaluation at Enhance Center after the EMG and NCS testing.

144. Another aspect of the defendants' predetermined treatment protocol was the recommendation of injections for nearly every patient, whether injections were medically indicated or not, and typically including recommendations for numerous different types of injections without regard to patients' actual conditions.

145. Medical services that are ordered pursuant to a predetermined treatment protocol and not based on patients' actual medical conditions are not compensable under the Michigan No-Fault Act and Allstate is entitled to the return of money paid as a result of the defendants' implementation of such a predetermined treatment protocol.

**B.** **UNNECESSARY ELECTRODIAGNOSTIC TESTING**

146. Enhance Center routinely billed for medically unnecessary EMG and NCS testing that was not medically indicated when ordered and was not used to inform patients' courses of treatment.

147. EMG testing involves the use of an electromyography machine to record the electrical activity of a skeletal muscle to evaluate the existence of muscle and/or nerve abnormalities.

148. A needle EMG is an invasive procedure that involves the insertion of a small needle electrode directly into an individual muscle.

149. To perform an NCS, the clinician must measure nerve impulses following nerve stimulation and obtain information regarding the speed (i.e., velocity), timing, and strength (i.e., amplitude) of nerve impulses.

150. NCS involve tests in which peripheral nerves in the upper and lower limbs (i.e., arms and legs) are stimulated through the skin by the application of an electrical current.

151. For EMG and NCS testing to be medically justified, the clinical examination must diagnose symptoms or signs of radiculopathy, which is a pathological condition of the nerve roots where one or more root nerves along the spine become damaged causing radiating pain to the part of the body served by the particular nerve.

152.   The patient's subjective symptoms alone cannot properly support the performance of an electrodiagnostic study.

153.   EMG and NCS are not indicated where, as is the case with nearly all patients of the defendants, neurologic deficits are not detected in the patients.

154.   Despite this, the defendants routinely ordered EMG and NCS testing based solely on a patient's subjective reporting, without first making objective findings of abnormal neurology, without first giving sufficient time for conservative treatments to be effective, and even where neither the patient's reported symptoms nor objective findings supported such testing.

155.   In addition, as discussed previously, the defendants frequently ordered EMG and NCS testing for a diagnosis of radiculopathy based solely on patients' subjective complaints, but then proceeded with therapeutic procedures such as ESI before the EMG and NCS testing ever occurred.

156.   Even when testing did occur prior to treatment, the defendants disregarded the results of such testing if it did not conform to their existing diagnosis in order to continue billing by implementing their predetermined treatment protocol.

157.   As one example of the defendants' use of predetermined diagnoses and treatment protocol to order and bill for unnecessary electrodiagnostic testing, patient S.P. (Claim No. 0575433370) was seen at Enhance Center for an initial evaluation on January 15, 2021.

158.   At that time, S.P. denied any radicular symptoms.

159.   Despite S.P.'s denial of radicular pain, and despite Enhance Center performing no examination or testing of S.P. that revealed any neurological deficit, Enhance Center diagnosed S.P. with lumbar radiculopathy.

160.   Enhance Center made this diagnosis to justify ordering EMG testing for S.P., and to allow it to recommend a lumbar ESI, which it claimed S.P. was a "good candidate" to receive.

161.   On January 29, 2021, Enhance Center billed for EMG and NCS testing of S.P., the results of which did not support a radiculopathy diagnosis.

162.   Despite this result, Enhance Center continued to recommend, and subsequently billed for, a lumbar ESI that failed as S.P.'s low back pain returned just three (3) to four (4) days after the injection (i.e., after the anesthetic used for the procedure wore off).

163.   Electrodiagnostic testing that is ordered solely to generate additional billing, is ordered contrary to standards of care, is not used to guide patient treatment, and is disregarded when contrary to the defendants' predetermined treatment protocol, cannot be medically necessary and is not compensable under the No-Fault Act.

C.   **EXCESSIVE AND UNNECESSARY INJECTIONS**

164.   As discussed above, the defendants routinely ordered unnecessary injections for nearly every patient as part of their treatment protocol.

165.   The performance of invasive procedures, including injections, must be based on legitimate medical necessity.

166.   Examinations billed by the defendants, if they were performed at all, resulted only in boilerplate findings and treatment plans that were not adequate to support the performance of invasive procedures, and injections often were ordered and billed before the testing intended to establish the medical necessity of such procedures even occurred.

167.   Despite this, the defendants pressured patients to undergo multiple injections, often beginning at the initial patient visit (even when an initial visit occurred almost immediately after a patient's alleged accident), because such procedures generated a raft of charges to Allstate.

168.   The defendants routinely subjected patients to a battery of excessive and unnecessary injections and injection-related services, including multiple facet block injections and ESI that were not medically appropriate.

169.   The defendants also pressured patients to agree to injections even when patients had not yet attempted conservative treatment, and where there had not been sufficient time since the patient's accident to permit the normal and expected minor

pain and soreness from the accident to resolve, both of which practices are contrary to the accepted standard of care.

170. Indeed, the defendants rarely allowed conservative treatment to run its course prior to recommending ESI and other injections, and frequently encouraged patients to undergo ESI almost immediately after alleged accidents.

171. Even in those instances where patients reported improvement from conservative treatment, the defendants nonetheless continued to pressure patients to undergo injections.

172. The defendants continued to pressure patients to undergo injections even when prior injections were ineffective, and where additional injections were not medically indicated.

173. Representative of the defendants' practice of billing for unnecessary and improper injections is D.M. (Claim No. 0528789407), who allegedly underwent an initial evaluation at Enhance Center on December 9, 2019, and was diagnosed with low back pain, sacroiliitis, right knee pain, left knee pain, right hip pain, and left hip pain.

174. Following re-evaluations on February 11, 2020 and March 10, 2020, at which time Enhance Center again diagnosed D.M. with low back pain, it billed for a midline ESI on March 10, 2020, the report for which refers to a diagnosis of lumbar radiculopathy that is contrary to each of the previous evaluations of D.M.

175.    Enhance Center allegedly followed up with D.M. on April 6, 2020, at which time it reported that her low back pain returned just five (5) days after the ESI, which is indicative of a failed procedure since ESI treatments should provide long-term pain relief to be considered effective.

176.    Despite this, Enhance Center reported that D.M. had an "excellent response" to the ESI, and recommended she "repeat [the] L4-L5 ESI as needed."

177.    Enhance Center's routine recommendation that patients repeat ESI "as needed," particularly where pain relief lasted only a few days, is contrary to the standard of care, which provides that patients should undergo ESI no more than three (3) times in the space of six (6) months or four (4) per year, and that ESI should only be repeated if they provide substantial, lasting pain relief.

178.    On September 23, 2020, Enhance Center billed for a second lumbar ESI to D.M. despite the failure of the first injection and which, unsurprisingly, again resulted in pain relief that lasted only a few days.

179.    Following the failed second lumbar ESI, Enhance Center continued to bill for additional injections to D.M. that were not medically justified.

180.    For example, on November 5, 2020, Enhance Center billed for a genicular nerve block injection to D.M.'s left knee despite the fact that just two (2) weeks earlier it reported that D.M's right knee pain was worse than her left knee

pain, and even though the treatment plan for D.M's knee pain was for her to return to physical therapy, which D.M. reported had given her "positive results" in the past.

181.    One month later, Enhance Center billed Allstate for bilateral diagnostic lumbar facet injections, also known as medial branch block ("MBB") injections, which involve injecting anesthetic near identified medial branch nerves that feed out from the facet joints in the spine, to D.M.

182.    Enhance Center billed for this alleged injection procedure despite never having included MBB injections in any prior treatment plan for D.M., and even though its evaluation report immediately prior to the alleged injection stated that the only treatment plan for D.M.'s back pain at that time was to continue physical therapy.

183.    The defendants routinely ordered diagnostic facet block injections without regard to medical necessity.

184.    Facet block injections are intended to be diagnostic, in that if a patient experiences a sufficient level of pain relief for an appropriate period of time then the facet joint is determined to be the possible source of the patient's pain, indicating the patient is a candidate for certain treatments such as medial branch radiofrequency ablation or rhizotomy.

185.    The MBB injections billed by the defendants were not based on appropriate clinical findings of ongoing symptoms that did not respond to

conservative treatment, and injections frequently were recommended even when patients' reports of pain and diagnoses changed from one appointment to the next and when patients reported that conservative treatment was helping.

186.   Diagnostic testing that does not address a patient's actual medical condition and that does not conform to a stated treatment plan or established standards of care is not medically necessary.

### D.   UNNECESSARY EPIDUROGRAMS

187.   In conjunction with the numerous improper ESI ordered and billed by the defendants discussed previously, the defendants frequently billed for epidurograms that allegedly were used to assist in needle placement for those injections.

188.   Epidurograms for mapping of the epidural space to determine needle placement for procedures such as injections generally are not medically necessary.

189.   Epidurograms are only considered medically necessary when both of the following are met: (1) medical/surgical history suggests significantly abnormal anatomy of the epidural space, and (2) diagnostic mapping of anatomy of the epidural space beyond available CT or MRI imaging is required to plan a therapeutic procedure.

190. Neither of these requirements was ever present in any of the cases where the defendants billed Allstate for an epidurogram as part of an injection procedure.

191. Moreover, if the specific conditions of a particular case require the use of an epidurogram in the performance of an injection, the reasons and medical necessity for the epidurogram must be specifically documented.

192. Billing guidelines also provide that when an epidurogram is performed, a formal radiological report must be prepared that includes images obtained during the epidurogram.

193. The documentation and reporting required to bill for the performance of an epidurogram as part of an injection were never met by the defendants.

194. For example, Enhance Center billed Allstate for an alleged lumbar ESI to patient G.L. (Claim, No. 0413800657) on January 30, 2017, and also billed for an epidurogram using CPT code 72275 even though, as previously discussed, Enhance Center did not actually perform an epidurogram at all.

195. Moreover, the procedure report prepared by Enhance Center does not document any reason for the alleged epidurogram, and no images from the alleged epidurogram were included with the report.

196.   As another example, Enhance Center billed for an epidurogram in conjunction with a lumbar ESI administered on January 4, 2018 to patient J.J. (Claim No. 0415922814).

197.   The Enhance Center report for the January 4, 2018 injection does not document any need or reason for performing an epidurogram on that date, and it includes no images from the alleged epidurogram.

### E.   UNNECESSARY SURGERIES AND PROCEDURES

198.   The defendants also billed for therapeutic procedures and surgeries that were not medically indicated or appropriate.

199.   One type of procedure frequently billed by the defendants that was not medically appropriate or warranted was ablation procedures, such as radiofrequency ablations and radiofrequency thermocoagulation procedures ("RFAs").

200.   RFAs are therapeutic procedures that, following an appropriate diagnosis, are intended to provide long-term relief, at least six (6) months to a year, of axial spinal pain.

201.   Typically, a patient experiencing axial spinal pain is considered a candidate for a RFA if the patient receives a diagnostic MBB injection, and experiences significant pain relief, at least 80%, for an appropriate period of time following the injection.

202.  Following a diagnostic MBB, a practitioner must carefully and thoroughly evaluate and document the effectiveness of the MBB in order to determine whether an RFA procedure is a medically appropriate treatment.

203.  Contrary to the standard of care and applicable guidelines, the defendants recommended and billed for RFAs without establishing that the procedures were medically appropriate.

204.  For example, patient K.R. (Claim No. 0571171081) was allegedly involved in an auto accident on November 18, 2019, after which she received treatment for several months with a different medical provider, and during which time she did not complain of lower back pain.

205.  Approximately sixteen (16) months after her alleged accident, K.R. underwent an initial visit at Enhance Center on March 19, 2021, and Enhance Center proceeded to recommend and bill Allstate for a lumbar ESI that did not alleviate K.R.'s pain.

206.  Following the unsuccessful ESI, and despite continuing to diagnose K.R. with lumbar radiculopathy, Enhance Center then billed for a diagnostic bilateral lumbar MBB injection at three (3) vertebral levels on June 15, 2021, which as discussed above is a diagnostic injection intended to identify the source of axial, not radicular, pain and then repeated the same MBB injections on July 16, 2021.

207. At a follow-up examination five (5) days after the second set of MBB injections, K.R. reported that she was "unsure if she had had improvement" from the MBB injections.

208. Despite K.R. not reporting a benefit from the MBB injections that would justify proceeding with a RFA procedure, Enhance Center nevertheless billed for a lumbar radiofrequency thermocoagulation procedure just ten (10) days later.

209. Unsurprisingly, given the failure of the MBB injections to alleviate K.R.'s reported pain, at a follow-up exam with a nurse practitioner at Enhance Center on August 12, 2021, K.R. reported that the ablation procedure had provided pain relief for just one (1) week, demonstrating it was a failed procedure.

210. Despite the failure of the initial ablation procedure, on September 7, 2021, Enhance Center billed for another lumbar radiofrequency thermocoagulation procedure.

211. Predictably, since there was never any medical basis for performing the RFA procedures in the first place, the ablation procedure on September 7 also failed.

## IX.   FRAUDULENT BILLING PRACTICES

212. Providers like Enhance Center and Tarabishy have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

213.   The defendants failed to meet this responsibility and instead submitted bills at unreasonable amounts to Allstate for unlawful, medically unnecessary, and excessive services, and used fraudulent billing practices to do so, as discussed *infra*.

214.   The medical records, bills, and invoices submitted to Allstate by the defendants contained CPT codes.

215.   The bills submitted to Allstate by the defendants were submitted on Health Insurance Claim Forms (HICF) approved by the National Uniform Claim Committee (NUCC) and referenced in the NUCC Instruction Manual.

216.   The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

217.   Despite the warning on the back of the HICF forms, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Allstate through interstate wires and the U.S. Mail.

A.   **FRAUDULENT UNBUNDLING**

218.   Unbundling occurs when a provider bills separately for individual components of a procedure that are included in another billing code also billed for the same date of service.

219. Defendants Enhance Center and Tarabishy routinely and improperly unbundled charges to Allstate associated with injections and other alleged procedures.

220. One frequent method of fraudulent unbundling used by the defendants was to bill for the alleged use of fluoroscopic guidance during injections when such guidance is expressly included in the charge for the injection itself.

221. For example, the defendants routinely included a separate charge for fluoroscopic guidance with their bills to Allstate for purported platelet rich plasma ("PRP") injections.

222. Enhance Center and Tarabishy submitted numerous bills for payment to Allstate for PRP injections using CPT code 0232T, which is the code for reporting the injection of platelet rich plasma to a targeted site, and also included a separate charge for fluoroscopic guidance using CPT code 77002, even though the description for CPT code 0232T expressly includes all image guidance.

223. As one example of unbundling charges for fluoroscopic guidance, Enhance Center billed Allstate $10,000 for an alleged PRP injection administered to patient H.A. (Claim No. 0591302740) on October 6, 2020, and also included a separate $1,000 charge for fluoroscopic guidance using CPT code 77002 that was improperly unbundled from the billing for the injection itself.

224.    Charges for fluoroscopic guidance that are unbundled from the underlying procedure are fraudulent.

225.    Allstate is not obligated to pay bills for fraudulently unbundled charges for fluoroscopic guidance and is entitled to recover all amounts paid to the defendants for such improper charges.

### B.    FRAUDULENT USE OF BILLING MODIFIERS

226.    One way the defendants sought to disguise their fraudulent billing practices in order to induce Allstate to pay for services that they improperly billed was through the misuse of CPT code billing modifiers.

227.    CPT code modifiers are used to indicate to payors that a service or procedure has been altered by some specific circumstance.

228.    A billing modifier that the defendants frequently utilized to disguise their improper billing was CPT code modifier 59, which is appended to a CPT code to indicate that a procedure that is not ordinarily payable separately from the first procedure billed on the same date of service is separate and distinct from the first procedure and should be paid based on the specific facts of the particular situation.

229.    Appending modifier 59 to CPT Codes indiscriminately is a deceptive practice intended to bypass claim adjudication systems that would detect fraudulent unbundling.

230. Indeed, the federal government has released a publication warning providers that CPT Code modifier 59 was being overused and was associated with cases of fraud and abuse.

231. As one example of the defendants' misuse of modifier 59, as previously described the defendants frequently unbundled charges for fluoroscopic guidance using CPT code 77002 when guidance was included in the main procedure being performed, such as PRP injections.

232. To disguise that the charge for fluoroscopic guidance was unbundled from the injection procedure, the defendants used CPT code modifier 59 with the fluoroscopic guidance charge, falsely representing that it was a distinct and separately billable service when it was not.

233. Another CPT code modifier that the defendants frequently included on their bills to Allstate was modifier 25, which is used to report a separate and significant evaluation and management service provided on a day when another service was provided to the patient by the same physician or other qualified health care professional.

234. The defendants utilized CPT code modifier "25" in order to improperly bill for patient evaluations on the same date they billed for procedures such as injections.

235. Billing guidelines for patients undergoing various, defined medical procedures, such as injections and surgeries, establish a global surgery "package" of components of a medical procedure that are included in the CPT billing code for the procedure, and includes all the necessary services normally furnished before, during, and after a procedure.

236. These guidelines apply in any setting, including inpatient hospitals, outpatient hospitals, ambulatory surgical centers, and physician's offices.

237. The global surgery package includes patient evaluations during a defined period of time before, on the day of, and after surgery based on the type of surgical procedure performed.

238. Providers may not separately bill for the evaluation of a patient related to the procedure being performed if it occurs during the global surgery period.

239. The guidelines establish three global surgery periods that apply to different types of procedures: a "zero-day" post-operative period for certain identified minor procedures, such as injections, that prohibits providers from billing for a separate patient evaluation on the day of the procedure; a "10-day" post-operative period for other identified procedures that prohibits providers from billing for a separate patient evaluation on the day of the procedure and for ten (10) days immediately following the date of the procedure; and a "90-day" post-operative period for major surgeries that prohibits providers from billing for a separate patient

evaluation one (1) day before the procedure, on the day of the procedure, and for ninety (90) days immediately following the date of the surgery.

240.   Many of the injections and procedures billed by the defendants at issue in this litigation are included in the global surgery period, and typically fall within the "zero-day" post-operative period, meaning the defendants were prohibited from separately billing for evaluation and management of the patient on the day they received injections.

241.   In order to circumvent the limitation on billing for patient evaluations on the same day they billed for injections and other procedures, and in an attempt to fraudulently induce Allstate to pay them amounts to which they were not entitled, the defendants used CPT code modifier "25" to represent to Allstate that the evaluations billed on those days were separate and distinct from injections and other procedures billed on the same date.

242.   In fact, those evaluations were rarely, if ever, separate and distinct from the injections and other procedures billed by the defendants, and the use of modifier "25" was fraudulent.

243.   As an example of this practice, Enhance Center billed both for a lumbar ESI administered to S.P. (Claim No. 0575433370) on March 2, 2021, and for a patient re-evaluation on the same date, again using CPT code modifier "25" to

represent that the evaluation was a separate and distinct event from the lumbar injection, and therefore was properly billed separately.

244.  In fact, Tarabishy simply reviewed the results of a prior MRI of S.P.'s lumbar spine, which he needed to do anyway prior to administering a lumbar ESI, and which was therefore an integral part of the injection procedure, not a separate and distinct service.

245.  Enhance Center's billing for the evaluation of S.P. on March 2, 2021 as a separate event from the injection that day was fraudulent.

## C.    FRAUDULENT UPCODING

246.  As discussed above, the defendants made misrepresentations to Allstate by submitting documentation that included CPT codes for medical services that (1) were not actually performed, (2) were not performed consistent with established standards of care, and (3) were wholly unwarranted and unnecessary.

247.  The billing codes submitted to Allstate by Enhance Center and Tarabishy also consistently exaggerated the complexity of evaluations purportedly rendered in order to inflate the charges submitted to Allstate.

248.  Physician examinations of patients are billed using CPT codes that reflect the complexity involved in the examination and it is the responsibility of the provider to select the appropriate CPT code for the complexity of the examination.

249.    There are five (5) levels at which an office visit/examination or office consultation can be billed, with level one being the least involved examination and level five being the most complex.

250.    Initial office visits/examinations are billed using a CPT code that starts with the numbers "9920"; re-examinations are billed using a CPT code that starts with the numbers "9921"; and consultations are billed using a CPT code that starts with the numbers "9924."

251.    The final number to complete each five-digit CPT code for examinations and consultations is one (1) through five (5), depending on the complexity of the evaluation performed.

252.    To properly bill using level 5 complexity codes, the physician must have taken a comprehensive history, performed a comprehensive examination, and engaged in medical decision-making of high complexity.

253.    To properly bill using level 4 complexity codes, the physician must have taken a comprehensive (initial encounter) or detailed (re-evaluation) history, performed a comprehensive (initial encounter) or detailed (re-evaluation) examination, and engaged in medical decision-making of moderate complexity.

254.    The AMA has guided that level 5 initial examinations should involve approximately 60 minutes of face-to-face time with the patient, and level 5 re-

examinations should involve approximately 40 minutes of face-to-face time with the patient.

255. Level 4 examinations typically involve 45 minutes of face-to-face time, and level 4 re-examinations typically involve 25 minutes of face-to-face time.

256. To warrant a medical bill demanding payment for a level 4 examination, the injury/condition necessarily requires: moderate risk of mortality, morbidity and/or complications; moderate diagnoses and review of complex data; and requires the medical provider to: (1) obtain comprehensive patient histories; (2) conduct comprehensive examinations; and (3) evaluate the patient (face-to-face) in an interaction lasting approximately 45 minutes.

257. Since January 1, 2017, Enhance Center has billed for initial patient examinations as level 4 or 5 examinations 94% of the time. *See* Exhibit 1.

258. During the same period, Enhance Center has never billed Allstate for less than a level 3 initial examination. Id.

259. During the same period, Enhance Center billed Allstate for level 4 or higher re-examinations 81.9% of the time, and billed for a level 3 or higher re-examination 99.7% of the time. Id.

260. Enhance Center and Tarabishy routinely billed examinations and re-examinations at level four and level five even though their records do not meet the requirements established by the AMA to bill office visits at a level four or level five.

261. As previously described, many of the defendants' records are largely copied and pasted between appointments and treatment plans following initial evaluations, and recommend a similar course of treatment for nearly every patient.

262. Reports for patient re-examinations almost always simply continue the same course of care that had already been prescribed (regardless of whether such course of care was improving the patients' conditions), and nearly every report copies from previous evaluation reports with only minor additions and changes.

263. Reports also use the same cut-and-paste language to describe each evaluation and alleged discussions with patients, demonstrating that the evaluations did not satisfy the level of complexity in the examination and decision making performed required of the billing submitted by the defendants.

264. For these patient appointments resulting in formulaic reports and records based on the predetermined treatment protocol described above, the defendants improperly upcoded bills to represent alleged complex medical evaluations.

265. The defendants engaged in this improper and fraudulent upcoding in order to increase the amount they were able to bill to Allstate for patient appointments.

266. As one example of the defendants' failure to satisfy the required complexity of decision making and the thoroughness of patient evaluations

necessary to bill for a level 4 re-examination, Enhance Center billed Allstate using CPT code 99214 for a re-examination of S.P. (Claim No. 0575433370) on March 2, 2021, which was the same day it also billed for a lumbar ESI.

267. The report prepared for the re-examination states that it was limited to a review of a lumbar MRI, left several blanks in the subjective patient assessment portion of the report, and left the "assessment" and "plan" portions of the report entirely blank.

268. Enhance Center also recorded that the only "objective" assessment of S.P. was limited to measuring her temperature, height, and weight, all of which prove that Enhance Center did not engage in the type of complex decision making required to justify the billing it submitted for the examination.

269. All bills submitted to Allstate by the defendants using CPT codes 99204, 99205, 99214, and 99215 as a matter of course rather than based on an independent assessment of the complexity of medical decision-making were fraudulent.

## X.    EXCESSIVE AND UNREASONABLE CHARGES

270. Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." Mich. Comp. Laws § 500.3107(1)(a).

271.   The defendants routinely billed Allstate at rates that were unreasonable and had no relation to the services allegedly performed.

272.   In each such case, including those described in the following subsections, Allstate was harmed when it was induced to pay the unreasonable amounts billed by the defendants.

273.   Allstate also was harmed even when it did not pay the unreasonable and excessive amounts charged by the defendants, because it was nevertheless obligated to investigate and adjust each insurance claim thereby incurring costs.

A.   EXCESSIVE AND UNREASONABLE CHARGES FOR URINE DRUG TESTING

274.   Enhance Center routinely billed Allstate for presumptive urine drug testing that was not medically necessary, and for which it charged excessive and unreasonable amounts.

275.   Enhance Center most often billed Allstate for presumptive drug testing using CPT code 80307, which refers to urine drug testing that is performed by instrument chemistry and analyzers (e.g., utilizing immunoassay, chromatography, and mass spectrometry either with or without chromatography), and is a test that is inexpensive and provides rapid results.

276.   The payment rate established by the Centers for Medicare and Medicaid Services ("CMS") for a presumptive drug screening for up to nine (9) different substances is $62.14.

277.   Enhance Center always billed Allstate $450 for these presumptive drug screens, which took at most only a few minutes to conduct if they were performed at all, an amount that is more than 542% higher than the highest CMS payment amount.

278.   The amount billed by Enhance Center for presumptive drug testing was excessive and unreasonable and Enhance Center cannot sustain its burden of proving otherwise.

**B.    EXCESSIVE AND UNREASONABLE CHARGES FOR SURGICAL PROCEDURES AND INJECTIONS**

279.   To the extent the procedures and injections billed by Enhance Center actually occurred, the defendants routinely billed exorbitant and unreasonable amounts for those procedures.

280.   Ablation procedures were one type of procedure Enhance Center frequently billed and for which they consistently billed excessive and unreasonable amounts.

281.   Enhance Center billed Allstate between $2,800 and $2,900 for ablation procedures on a single vertebral level using CPT codes 64633 or 64635, and billed an additional $3,200 to $3,400 for second vertebral levels at the same time, using CPT codes 64634 and 64636.

282.   For example, Enhance Center billed Allstate $2,800 using CPT code 64635 and $3,200 using CPT code 64636, for a total charge of $6,000, for an alleged

two vertebral level lumbar ablation procedure on K.R. (Claim No. 0571171081) on July 31, 2021.

283.   In 2021, the CMS payment amount in the Detroit region for CPT code 64635 was just $440.32 and for CPT code 64636 the CMS payment amount was $182.03, meaning that the total amount that Enhance Center billed Allstate for patient K.R.'s procedure was more than 864% higher than the amount CMS would have paid for the same procedure.

284.   Charges that are more than 864% higher than what CMS pays providers for the same procedure cannot possibly be reasonable or appropriate.

285.   The defendants' charges for other types of procedures, such as injections, were similarly excessive and unreasonable.

286.   The following chart summarizes some of the most common injections billed by Enhance Center during the relevant period, the average amounts they billed for those procedures, and the percentage markup over CMS payment rates:

| CPT Codes | Description | Enhance Center Average Charge | Average CMS Non-Facility Payment Amount, in Michigan, 2021 | Enhance Center Percent Markup |
|---|---|---|---|---|
| 62321-62323 | Injection(s), of diagnostic or therapeutic substance(s) | $1,848 | $239.13 | 672% |
| 64483-64484 | Injection of Anesthetic Agent, Diagnostic or Therapeutic | $1,855.56 | $187.82 | 887% |
| 64490-64495 | Injection(s), paravertebral facet joint | $1,897 | $131.41 | 1,343% |

287. Enhance Center's charges for surgical procedures and injections are not and were not reasonable and the defendants cannot sustain their burden of proving otherwise.

### C.   EXCESSIVE AND UNREASONABLE CHARGES FOR EMGs AND NCS

288. As previously discussed, Enhance Center and Tarabishy frequently ordered medically unnecessary EMGs and NCS.

289. They also billed Allstate exorbitant amounts for the EMG and NCS testing they ordered.

290. For EMG testing billed using CPT code 95886, Enhance Center charged from $1,600 to $2,000.

291. By way of comparison, the CMS payment rate in the Detroit area for EMGs billed by providers such as the defendants in 2021 using CPT code 95886 was $104.98, meaning the amounts that Enhance Center billed Allstate was between 1,424% and 1,805% higher than the amount CMS pays for the same testing.

292. Similarly, for NCS testing, nine (9) to ten (10) studies, billed using CPT code 95911, Enhance Center routinely billed Allstate $1,900.

293. By comparison, the CMS payment rate in the Detroit area for NCS testing, nine (9) to ten (10) studies, billed by providers such as the defendants using CPT code 95911 in 2021 was $232.61, meaning the amounts that Enhance Center billed Allstate was 716% higher than the amount CMS pays for the same testing.

294.    Charges that are 716% higher than the CMS payment amount for the same services cannot possibly be reasonable.

295.    The defendants' charges for EMGs and NCS are not and were not reasonable and the defendants cannot sustain their burden of proving otherwise.

## XI.    MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A.    MISREPRESENTATIONS BY THE DEFENDANTS

296.    To induce Allstate to pay promptly their fraudulent charges, the defendants submitted to Allstate false documentation that materially misrepresented that the services they referred and billed were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

297.    Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

298.    Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]."  Mich. Comp. Laws § 500.3157(1).

299.    Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily

warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

300. There are no less than ten (10) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

a. Enhance Center and Tarabishy routinely billed for services that were not performed at all.

b. Enhance Center and Tarabishy falsified and altered medical records to bill for services that were not performed and to create a false appearance of injury to justify excessive and unnecessary medical treatment and billing.

c. Enhance Center and Tarabishy improperly engaged in *quid pro quo* relationships with associates in exchange for the referral of illegally solicited patients. These defendants relied on associates who utilized runners, police reports, and telephonic solicitation to identify and steer individuals who claimed to be in motor vehicle accidents to unnecessary treatment and intentionally sought out patients who did not require medical care and would not have presented for the same but for the unlawful solicitation. These defendants' methods of obtaining patients did not include considerations of medical necessity and allowed individuals with no medical training to control patients' treatment.

d. Enhance Center and Tarabishy used an improper predetermined treatment protocol, implemented by use of boilerplate, fabricated, and exaggerated purported examination findings, to bill for excessive injections, surgical procedures, urine drug testing, medications, and diagnostic testing.

e. Enhance Center and Tarabishy ordered and pressured patients to undergo injections that were medically unnecessary and ordered in violation of applicable standards of care in furtherance of the scheme

to bill Allstate as much as possible, and not based on the individual needs of patients.

f.   Enhance Center and Tarabishy ordered and billed for unnecessary testing, including EMGs, NCS, urine drug testing, and diagnostic injections that were medically unnecessary and ordered in violation of applicable standards of care in furtherance of the scheme to bill Allstate as much as possible, and not based on the individual needs of patients.

g.   Enhance Center and Tarabishy submitted claims using multiple CPT codes to describe the same procedure allegedly performed, which is a fraudulent billing practice called unbundling.

h.   Enhance Center and Tarabishy submitted claims representing that purported patient encounters were more complex than they actually were, which is a fraudulent billing practice called upcoding.

i.   Enhance Center and Tarabishy submitted claims using billing modifiers to represent that the services being billed were separate and distinct services that were properly billed separately when they were not, which is a fraudulent billing practice.

j.   Enhance Center and Tarabishy submitted bills at rates that had no basis and were many times higher than reasonable to charge for services, if such services were rendered at all.

301.   As detailed *supra*, the defendants frequently violated standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

302.   If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

303.   The foregoing facts – including billing for services not rendered, falsifying medical records, illegal solicitation of patients, using a predetermined treatment protocol to inflate charges, and misrepresenting the necessity of treatment

and testing – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

304.   Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment and testing by the defendants unnecessary and unlawful.

305.   The fact of unnecessary treatment is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 and 2.

306.   Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act faxed and mailed to Allstate by the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

307.   Moreover, each HICF submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

308.   Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via interstate wires and the U.S. Mail, the

defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, testing, procedures, and ancillary services for which they billed Allstate.

309. As the defendants did not render lawful and reasonably necessary medical treatment and testing, and misrepresented the treatment and testing purportedly performed, each bill and accompanying documentation faxed or mailed by the defendants to Allstate constitutes a material misrepresentation.

### B.  ALLSTATE'S JUSTIFIABLE RELIANCE

310. The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

311. At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of services allegedly provided and referred by them to prevent Allstate from discovering that the claims submitted by the defendants were not compensable under the No-Fault Act.

312. These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of medical treatment, testing, and services in order to seek payment under Michigan's No-Fault Act.

313.   Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

314.   Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

315.   In reliance on and as a result of the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

316.   Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services billed.

317.   As a result, Allstate has paid in excess of $452,275 to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for payment under the Michigan No-Fault Act.

## XII.   MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

318.   As discussed above, the referrals, treatment, and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

319.   The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibit 1, was to collect No-Fault benefits to which the defendants were not entitled because the medical services rendered, if at all, were not necessary and were not lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

320.   This objective necessarily required the submission of bills for payment to Allstate.

321.   The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service or sent through faxes over interstate wires.

322.   All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through interstate wires or the U.S. Mail.

323.   All medical records and bills submitted through interstate wires by the defendants were faxed from the defendants in Michigan to Allstate in Iowa.

324.   Allstate received all medical records and bills faxed to it by the defendants in Iowa.

325.   Every automobile insurance claim detailed herein involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, insurance payments, and the return of cancelled checks.

326.   It was foreseeable to the defendants that faxing bills and medical records to Allstate would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Allstate.

327.   Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

328.   The fraudulent medical billing scheme detailed herein generated hundreds of mailings and faxes.

329.   A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 2.

330.   As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via fax or mail related to each exemplar patient discussed in this Complaint.

331.   It was within the ordinary course of business for Enhance Center to submit claims for No-Fault payment to insurance carriers like Allstate through faxes and the U.S. Mail.

332. Moreover, the business of billing for medical services by Enhance Center at issue herein is regularly conducted by fraudulently seeking payment to which Enhance Center is not entitled through the use of fraudulent communications sent via faxes and the U.S. Mail.

333. In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for Enhance Center.

334. Enhance Center, at the direction and with the knowledge of its owner and manager Tarabishy, continues to submit claims for payment to Allstate and, in some instances, continues to commence litigation against Allstate seeking to collect on unpaid claims.

335. Thus, the defendants' commission of mail and wire fraud continues.

336. Both of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

337. As the defendants named herein agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

338.   Allstate reasonably relied on the submissions it received from the defendants, including the submissions set out in Exhibits 1 and 2 annexed hereto and identified in the exemplar claims discussed above.

## XIII. **DAMAGES**

339.   The pattern of fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

340.   Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $452,275.

341.   Exhibit 3, annexed hereto and incorporated herein as if fully set forth in its entirety, identify monies paid by Allstate to the defendants by date, payor, patient claim number, check number, and amount.

342.   Allstate's claim for compensatory damages, as set out in Exhibit 3, does not include payment made with respect to any Assigned Claim Facility/Michigan Automobile Insurance Placement Facility claimant.

343.   Every payment identified in Exhibit 3 was made by Allstate alone.

344.   Moreover, every payment identified in Exhibit 3 derives from a check sent by Allstate to the defendants through the U.S. Mail.

345.   As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only faxed and mailed medical records and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

346.   Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed and faxed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

347.   Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XIV.  CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Enhance Center Enterprise)
### Against Ayman Tarabishy, M.D.

348.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 347 set forth above as if fully set forth herein.

349.   Enhance Center constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

350.  In connection with each of the claims identified in the within Complaint, defendant Tarabishy ("Count I defendant") intentionally caused to be

prepared, faxed, and mailed false medical documentation by Enhance Center, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Enhance Center's business, or should have reasonably foreseen that the mailing of such false medical documentation by Enhance Center would occur, in furtherance of the Count I defendant' scheme to defraud.

351.   The Count I defendant knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 2.

352.   As discussed above, the Count I defendant repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Enhance, which Tarabishy knew would be billed by Enhance Center, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

353.   Tarabishy owned, managed, and controlled Enhance Center and implemented procedures and policies in order to perpetrate the scheme described herein.

354.   The Count I defendant submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury

and permitted Enhance Center to continue billing for unlawful and medically unnecessary treatment, if provided at all.

355.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Enhance Center for the benefit of the Count I defendant that would not otherwise have been paid.

356.   The Count I defendant's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

357.   By virtue of the Count I defendant's violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from Tarabishy three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by Tarabishy, and others acting in concert with him, together with the costs of suit, including reasonable attorney's fees.

### COUNT II
### COMMON LAW FRAUD
### Against All Defendants

358.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 347 set forth above as if fully set forth herein.

359.   The scheme to defraud perpetrated by Enhance Center and Tarabishy ("Count II defendants") was dependent upon a succession of material

misrepresentations of fact that the defendants were entitled to collect benefits pursuant to applicable provisions of the Michigan No-Fault Act.

360.   The misrepresentations of fact made by the Count II defendants include, but are not limited to, those material misrepresentations discussed in section XI.A, *supra*.

361.   The Count II defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

362.   The misrepresentations were intentionally made by the Count II defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment pursuant to applicable provisions of the Michigan No-Fault Act would be submitted to Allstate.

363.   The Count II defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

364.   Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

365. As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

### COUNT III
### CIVIL CONSPIRACY
### Against All Defendants

366. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 347 set forth above as if fully set forth herein.

367. Defendants Enhance Center and Tarabishy ("Count III defendants") combined and acted in concert to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment pursuant to applicable provisions of the Michigan No-Fault Act to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices.

368. The Count III defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

369. This purpose was known to all of the Count III defendants and intentionally pursued.

370.   Despite knowing that the defendants were not entitled to payment pursuant to applicable provisions of the Michigan No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they engaged in fraudulent billing practices, the Count III defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment.

371.   In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the insurance claims submitted.

372.   All of the Count III defendants directly benefited from the payments made to Enhance Center.

373.   Both of the Count III defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided one another in the commission of acts done for their benefit and to the unjustified detriment of Allstate.

374.   Accordingly, all of the Count III defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

## COUNT IV
## PAYMENT UNDER MISTAKE OF FACT
### Against Ayman Tarabishy, M.D., PLLC

375.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 347 set forth above as if fully set forth herein.

376.   Allstate paid the amounts described herein and itemized in Exhibit 3 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed by Enhance Center ("Count IV defendant").

377.   Allstate sustained damages by paying under a mistake of fact the claims submitted by the Count IV defendant, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

378.   The Count IV defendant would be unjustly enriched if permitted to retain the payments made to it by Allstate under a mistake of fact.

379.   Allstate is entitled to restitution from the Count IV defendant for all monies paid to and/or received by it from Allstate.

380.   The Count IV defendant's retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT V
## UNJUST ENRICHMENT
### Against All Defendants

381.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 347 set forth above as if fully set forth herein.

382.   Defendants Enhance Center and Tarabishy ("Count V defendants") submitted, caused to be submitted, or benefited from claims submitted to Allstate that caused Allstate to pay money, in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

383.   Allstate's payments constitute a benefit which the Count V defendants aggressively sought and voluntarily accepted.

384.   The Count V defendants wrongfully obtained or benefited from payments from Allstate through the fraudulent scheme detailed herein.

385.   The Count V defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT VI
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

386.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 347 set forth above as if fully set forth herein.

387.    Defendants Enhance Center and Tarabishy ("Count VI defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

388.    The Count VI defendants also billed for services not rendered.

389.    The Count VI defendants also billed for services pursuant to a fraudulent scheme whereby patients were subjected to a predetermined treatment protocol for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

390.    Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident.    Mich. Comp. Laws §§ 500.3105 and 500.3107.

391.    The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.    Mich. Comp. Laws § 500.3107.

392.    The lack of lawfully-rendered treatment (such as treatment arising from illegal solicitation, falsifying records, and unlicensed treatment) is also a defense to an insurer's obligation to pay No-Fault benefits.    Mich. Comp. Laws § 500.3157(1).

393.    Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident,

there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

394.   The Count VI defendants continue to submit claims under applicable provisions of the Michigan No-Fault Act for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

395.   The Count VI defendants will continue to submit claims under applicable provisions of the Michigan No-Fault Act absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and previously-denied insurance claims submitted by any of the Count VI defendants for any or all of the reasons set out in the within Complaint.

396.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count VI defendants billed for unnecessary and unlawful treatment that is not compensable under applicable provisions of the Michigan No-Fault Act.

397.   Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count VI defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

398.   As such, the Count VI defendants have no standing to submit, pursue, or receive benefits or any other payment from Allstate, and Allstate requests a

judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count VI defendants cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

399. Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count VI defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## XV.   <u>DEMAND FOR RELIEF</u>

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, and ASMI Auto Insurance Company respectfully pray that judgment enter in their favor as follows:

**<u>COUNT I</u>**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Enhance Center Enterprise)**
**Against Ayman Tarabishy, M.D.**

(a)      AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT II
## COMMON LAW FRAUD
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT III
## CIVIL CONSPIRACY
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT IV
## PAYMENT UNDER MISTAKE OF FACT
### Against Ayman Tarabishy, M.D., PLLC

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT V
## UNJUST ENRICHMENT
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT VI
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

(a)     DECLARE that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by Ayman Tarabishy, M.D., PLLC, and Ayman Tarabishy, M.D., jointly and severally, for any or all of the reasons set out in the within Complaint;

(b)     DECLARE that Ayman Tarabishy, M.D., PLLC and Ayman Tarabishy, M.D., jointly and severally, cannot seek payment from Allstate pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of

insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)    DECLARE that Ayman Tarabishy, M.D., PLLC and Ayman Tarabishy, M.D., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)    GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XVI.    **DEMAND FOR JURY TRIAL**

The plaintiffs hereby demand a trial by jury on all claims.

Respectfully submitted,

KTM

*/s/ Andrew H. DeNinno*

_____

Nathan A. Tilden (P76969)
ntilden@ktmpc.com
Andrew H. DeNinno
adeninno@ktmpc.com
Brad A. Compston
bcompston@ktmpc.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

Dated:  November 10, 2022        *Attorneys for Allstate*