UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALLSTATE INSURANCE
COMPANY et al.,

       Plaintiffs,

v.

AYMAN TARABISHY, M.D., PLLC
and AYMAN TARABISHY, M.D.,

       Defendants.
_____/

Case No. 2:22-cv-12736

Honorable Susan K. DeClercq
United States District Judge

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO STRIKE EXPERT REPORT AND SUPPLEMENT OF WILFRED L. HYNES, M.D., AND TO EXCLUDE HIS TESTIMONY AT TRIAL (ECF No. 57)**

In this civil RICO case, Plaintiffs Allstate Insurance and its affiliates accuse Defendants Dr. Ayman Tarabishy and his medical clinic, Ayman Tarabishy, M.D., PLLC (doing business as Enhance Center), of running a racketeering scheme to exploit Michigan's no-fault insurance law, MICH. COMP. LAWS § 500.3101 *et seq.*, by generating and submitting fraudulent medical bills for reimbursement. Defendants now move to strike the expert report and supplement of Allstate's proposed expert, Dr. Wilfred Hynes, and to exclude his testimony at trial. ECF No. 57. As explained below, Dr. Hynes is qualified to testify as an expert in this case—

subject to a few exceptions. Accordingly, the motion will be granted in part and denied in part.

## I. BACKGROUND

Wilfred Hynes, M.D., is a pain-management physician at Tufts Medical Center in Boston, Massachusetts. He is the Medical Director of the hospital's Pain Management Center and Co-Chair of its Pain Management Committee. ECF No. 57-5 at PageID.4063. Allstate retained Dr. Hynes "to testify regarding the fact, extent, and causation of the alleged services for which Allstate was billed [by the defendants] relative to patients at issue in this action . . . the medical necessity and reasonableness of the services billed by the defendants; the billing submitted by the defendants; and any other subjects or opinions referenced in his report, supplemental report, or in subsequent deposition testimony, including reasonable inferences and summaries arising therefrom." ECF No. 57-5 at PageID.3989–90.

Allstate disclosed Dr. Hynes's initial expert report on September 8, 2023. ECF No. 57-5. The report details Dr. Hynes's findings and opinions from his review of the defendants' treatment and billing records for more than 90 patients at issue in this litigation. *Id.* at PageID.3994–4060. Eighteen days later, Allstate provided a supplemental report by Dr. Hynes that contains five charts Allstate might "use[] at trial to summarize the opinions set forth in detail in [Dr. Hynes's] medical expert report." ECF No. 57-6.

Defendants move to strike Dr. Hynes's expert report and supplement, and to exclude his testimony at trial, based on several grounds:

(1) Dr. Hynes is not board-certified in the specialties of physical medical rehabilitation or brain injury medicine and is not qualified to render opinions about Defendants' treatments;

(2) Dr. Hynes is not an expert in CPT coding and is not qualified to render opinions about Defendants' CPT coding or billing;

(3) Dr. Hynes did not prepare the "Supplemental" expert report served on September 26, 2023;

(4) Dr. Hynes's opinions regarding "fraud" are beyond his purview and he is not qualified to give an opinion or testify about Defendants' intent;

(5) Dr. Hynes's reports contain analysis of patients for whom Plaintiffs are not seeking to recover damages and his findings regarding these patients are irrelevant; and

(6) Dr. Hynes's testimony will not assist the trier of fact and is significantly more likely to mislead a jury.

ECF No. 57 at PageID.3572–73.

## II. LEGAL STANDARDS

Federal Evidence Rule 702 governs the admissibility of expert testimony. It permits a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to testify if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the

>expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

The rule also commands that district courts play a "gatekeeping role" by screening out unsupported, unreliable, and speculative expert opinions. *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 668 (6th Cir. 2010) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).

Medical doctors are "generally competent" to testify about matters "within [their] own professional experience." *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 427–28 (6th Cir. 2009) (citing *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 982 (6th Cir. 2004)); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). "When, however, the doctor strays from such professional knowledge, his or her testimony becomes less reliable, and more likely to be excluded under Rule 702." *Gass*, 558 F.3d at 428. Even so, excluding testimony "is rarely justified in cases involving medical experts," especially when that testimony "is supported by extensive relevant experience." *Dickenson*, 388 F.3d at 982 (citation omitted).

Namely, so long as the expert's opinion has "a reasonable factual basis," it should not be excluded. *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993). "Rather, the testimony should be admitted, and any remaining challenges

merely go to the weight, as opposed to the admissibility, of the expert testimony." *United States v. Ramer*, 883 F.3d 659, 680 (6th Cir. 2018) (citing *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008)).

### III. DISCUSSION

### A. Dr. Hynes's Opinions on Medical Care

Defendants argue that Dr. Hynes is not qualified to serve as an expert because he has neither the relevant experience nor qualifications to opine on the treatments Dr. Tarabishy provided to patients. Specifically, both Dr. Hynes and Dr. Tarabishy are board-certified pain-management practitioners. But Dr. Tarabishy is also board certified in two additional specializations which he regularly practices: physical medicine and rehabilitation ("PM&R") and brain-injury medicine. *See* ECF No. 54-2 at PageID.1419.

Except as to certain aspects of brain-injury treatment—which will be addressed at the end of the analysis—Dr. Hynes is qualified to offer expert testimony on the medical care at issue in this case. Like Dr. Tarabishy, Dr. Hynes has had a long career in interventional pain-management: since 2005, Dr. Hynes has been the Medical Director of the Pain Management Center and Co-Chair of the Pain Management Committee at Tufts Medical Center in Boston, Massachusetts. ECF No. 57-5 at PageID.4063. He currently practices pain management there and is also board certified in Anesthesiology and Pain Management. *Id.*

Further, Dr. Hynes's report details his "extensive relevant experience," *Dickenson*, 388 F.3d at 982, with the types of patients (mainly auto-accident victims), injuries, and treatments at issue in this litigation:

> I am familiar with the diagnosis and treatment of patients diagnosed with a variety of chronic pain conditions, and the standard of care applicable to the management of these patients. This includes the appropriateness of pain management procedures, including injections; the appropriateness of opiate therapy; the monitoring of opiate patients with urine drug screening and confirmatory testing; the indications, performance, and appropriateness of interventional treatments for various spine conditions, including radiofrequency ablations; the necessity and indications for advanced imaging studies; the utilization of topical formulations in chronic pain; the necessary requirements for evaluation and management services; and the indications for the performance of EMG and NCV studies. My clinical practice including the diagnosing and treatment of patients with complaints of the multitude of pain disorders as seen in the reviewed patients files, and has included the performance of the interventional treatments offered, prescribing medications for these conditions, including opiates and topical medications, monitoring by urine drug screening and testing, and providing the appropriate billing for both interventional treatments and evaluation and management services. My clinical practice frequently includes the care and treatment of patients with pain complaints sustained from motor vehicle accidents, from minor to severe. I am familiar with the standards of care of the treatment of these patients by virtue of my training, education and experience of nearly 25 years in the field of pain management.

ECF No. 57-7 at PageID.3994.

Nonetheless, Defendants attempt to discredit Dr. Hynes's qualifications in several ways. *First*, they say that Dr. Hynes "has never practiced outside of an academic or hospital setting." ECF No. 57 at PageID.3597. At the motion hearing, Defendants argued this is significant because it means that, unlike Dr. Tarabishy, Dr.

Hynes does not treat patients throughout the entire course of their injuries. Even if this were true—Allstate contests this characterization of Dr. Hynes's practice, and Dr. Hynes's own report contradicts it, too—it does not justify excluding Dr. Hynes's opinions. If anything, this argument goes to the weight of the testimony, not its admissibility. *See Ramer*, 883 F.3d at 680.

*Second*, Defendants point out that Dr. Hynes's practice and certification are in pain management only, while Dr. Tarabishy's practice and certifications are in pain management, PM&R, and brain-injury medicine. ECF No. 57 at PageID.3597. Defendants say that, because Dr. Tarabishy's practice is a "combination" of all three of his specialties, Dr. Hynes is not qualified to testify about each and every medical procedure that Dr. Tarabishy performed. *Id.*

To bolster this argument, Defendants cite two provisions of Michigan statutes: MICH. COMP. LAWS § 600.2169(1)(a), which requires that experts in medical-malpractice suits practice the same specialty and have the same board certifications as the defendant-physician; and MICH COMP. LAWS § 500.3151(2)(a), which requires the same of physicians conducting an independent medical examination under the No-Fault Act. *See id.* at PageID.3598–99.

However, as Allstate points out, these state-law provisions have no bearing on the *Daubert* inquiry, *see* ECF No. 61 at PageID.4484–85, and Defendants provide no authority demonstrating otherwise. In fact, Defendants seemingly recognize this,

- 7 -

conceding that their citations "relate specifically to the statutory standard for medical malpractice cases," not the *Daubert* standard. ECF No. 57 at PageID.3599. Nonetheless, Defendants emphasize that this authority "illustrate[s] the point that a medical doctor is not qualified to give an expert opinion about every medical procedure, even those for which the 'expert' has admittedly no training." *Id.*

But under Rule 702, "[t]here is no requirement that experts share identical backgrounds to be able to opine about the same subject." *Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., LLC*, 858 F. Supp. 2d 505, 511 (D. Md. 2012). And Defendants do not really explain how pain management is so different from PM&R,[1] such that an expert in one could not testify about the other. Nor do they label any specific opinion of Dr. Hynes as one that only a PM&R specialist would be qualified to give. In fact, whatever differences between PM&R and pain management, even Dr. Tarabishy acknowledges there is overlap: he testified that, in the context of his practice, "it's really hard to draw a line where one ends and the other one starts." ECF No. 57-2 at PageID.3618. Again, any such difference goes to

---

[1] At his deposition, Dr. Tarabishy offered an off-the-cuff explanation of how pain management and PM&R differ: "So pain management is more interventional and pain management also has aspects of like cancer pain that PM&R doesn't have like some issues with chronic pain, addiction management, palliative, end of life care stuff, those are like pain management that are not PM&R. And PM&R has aspects in sports medicine, regenerative medicine, EMG's, nerve conduction studies, spinal cord injury, managing spasticity, managing patients, spinal cord injuries, brain injuries, sometimes cancer rehab, wound care." ECF No. 57-2 at PageID.3618–19.

- 8 -

the weight, not admissibility, of Dr. Hynes's testimony, and Defendants remain free to explore any areas of weakness or conflict on cross examination. *See Ramer*, 883 F.3d at 680.

Turning now to the brain-injury portion of the argument, Defendants say that Dr. Hynes is not qualified to opine on Defendants' assessment, diagnosis, or treatment of brain or neurological injuries. ECF No. 67 at PageID.4835–36. Allstate responds that this is a nonissue because "not once in his report does Dr. Hynes critique a brain-injury treatment allegedly rendered by the defendants." ECF No. 61 at PageID.4483.

True enough, the bulk of medical care at issue in this case is not neurological. However, Allstate's read of the report is not wholly correct—or at least it hides the ball. Neurological *treatments* aside, Dr. Hynes certainly critiques how Defendants handled diagnostic *testing* for neurological disorders, especially as related to Magnetic Resonance Imaging (MRIs):

> With the patient [A.B.] the cervical and lumbar MRIs were reviewed, but the brain MRI, which showed concern for malignancy, a meningioma, the results were apparently ignored and not documented at all. . . . Even for patient [A.B.] whose brain MRI identified hemosiderin deposits, likely due to minor bleeding, this did not change the patient's management a[t] all. . . . Brain MRI guidelines reflect reserving imaging for those patients with significant neurologic signs and symptoms indicative of concerning intracranial pathology.

ECF No. 57-5 at PageID.4002.

Dr. Hynes goes on to opine that "without concerning neurologic deficits, particularly considering the negative head CT scans, there was no indication to routinely proceed with a brain MRI on every patient with headache complaints. *Id.* at PageID.4003. Dr. Hynes specifically critiques Defendants' ordering of MRIs for several patients including H.A., *id.* at PageID.4015, A.B., *id.* at PageID.4016–17, W.C., *id.* at PageID.4019, and S.K., *id.* at PageID.4022, among others.

At his deposition, Dr. Hynes outlined the scope of his expertise in this area. ECF No. 57-4 at PageID.3922. He testified that he "[does not] have any training in brain injury," and that he is not an expert in brain injury. *Id.* at PageID.3923. However, he maintained that, based on his "review of the literature" outlined in his report, he could testify as to whether *ordering* brain MRIs was appropriate. *Id.* He also noted that he sees "a lot of patients . . . with whiplash injuries and complaints of headaches, a lot of occipital neuralgia headaches, but not specifically traumatic brain injury." *Id.* at PageID.3927. While some of his patients "can include traumatic brain injuries," it is not a "specific focus" of his practice. *Id.* Further, when Dr. Hynes sees patients with a brain MRI, he does not read the MRI himself, but instead relies on the radiologist's report. *Id.* at PageID.3928. In contrast, Dr. Hynes himself reads the MRIs for other parts of the body, without relying on a radiologist. *Id.* at PageID.3928–29.

Although weak, Dr. Hynes has provided a "reasonable factual basis" for his opinions on whether Defendants properly ordered neurological testing like MRIs. *L.E. Cooke*, 991 F.2d at 342. As noted above, Dr. Hynes has seen patients with head injuries, ordered diagnostic testing for some such patients, and reviewed medical literature on when ordering such testing is proper. This factual basis may be weak, but again, that is something Defendants may press on cross examination.[2] *See id.* ("any weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility"). However, given Dr. Hynes's admission that he does not interpret a patient's brain MRI himself, but instead relies on the radiologist's report, he may not offer opinions at trial that attempt to interpret the substance of any MRIs related to brain injuries.

In sum, Dr. Hynes may opine on the bulk of the medical care at issue in this case. The sole caveat is that he may not offer opinions at trial that attempt to interpret the substance of any MRIs related to brain injuries.

### B. Dr. Hynes's Opinions on Billing and CPT Coding

Defendants also argue that Dr. Hynes's opinions on Defendants' billing and use of CPT coding "go far beyond his purported area of expertise," and thus should be stricken. ECF No. 57 at PageID.3591–94. However, Dr. Hynes's report

---

[2] The same is true for Defendants' arguments as related to Nerve Conduction Studies (NCS) and Electromyography (EMG). *See* ECF No. 57 at PageID.3587, 3598.

specifically discusses his decades of experience providing the types of services and treatments at issue in this case—which includes billing and using CPT codes for those services and treatments. *Id.* at PageID.3994. This experience alone provides a sufficient basis for Dr. Hynes's testimony. *Dickenson*, 388 F.3d at 982; *Luna v. Bell*, No. 3:11-CV-00093, 2013 WL 12316066, at *3 (M.D. Tenn. Aug. 1, 2013) ("A court may find an expert qualified based on his experience alone, if the experience matches the scope of the proffered testimony on the central issue at trial." (citing *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 332–33 (6th Cir. 2001))). If Dr. Hynes's knowledge of the relevant billing and CPT codes is limited, incomplete, or flawed in some way, Defendants may explore that on cross-examination. *Ramer*, 883 F.3d at 680.

### C. Dr. Hynes's Opinions on Fraud

Defendants next argue that Dr. Hynes may not offer any opinions on fraud because those are legal conclusions. *Id.* at PageID.3600–02.

Dr. Hynes accuses Defendants of fraud several times in his report. For instance, he says that Defendants "exhibited clear patterns of health care fraud," ECF No. 57-5 at PageID.3995, and that they were "fraudulently submitting" bills to Allstate, *id.* at PageID.4001, and that "there was clear evidence of rampant fraud, waste, and abuse of health care resources," *id.* at PageID.4059.

Under Rule 702, experts may not testify to legal conclusions. *United States v. Melcher*, 672 F. App'x 547, 552 (6th Cir. 2016) (quoting *United States v. Nixon*, 694 F.3d 623, 632 (6th Cir. 2012)). An expert offers a legal conclusion by (1) defining the governing legal standard or (2) applying that standard to the facts of the case. *Id.* (citing *Torres v. Cnty. of Oakland*, 758 F.2d 147, 150–51 (6th Cir. 1985)).

Considering the first circumstance, when experts attempt to define the governing legal standard, they improperly invade the province of the judge, whose task is "to determine the applicable law and to instruct the jury as to that law." *Torres*, 758 F.2d at 150 (citation omitted). But this does not mean that experts can *never* use words that could also be legal terms of art, like "conversion" or "forged." *Melcher*, 672 F. App'x at 552. So long as the term is not a part of the governing legal standard, experts may use the term without offering a legal conclusion. *Id.* (quoting *United States v. Nixon*, 694 F.3d 623, 631 (6th Cir. 2012)).

Considering the second circumstance, when experts attempt to apply a legal standard to the facts of the case, they improperly invade the province of the jury, whose task is to decide the ultimate issue of liability. *See Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994). True, an opinion "is not objectionable just because it embraces an ultimate issue." FED. R. EVID. 704. But there is a distinction, albeit subtle, between an opinion that *embraces* an ultimate issue and one that *decides* the ultimate issue. *See Berry*, 25 F.3d at 1353. Namely, "[w]hen the rules speak of an

expert's testimony embracing the ultimate issue," all the expert may do is "suggest the answer" to it or "give the jury all the information" needed to come to its own legal conclusions. *Id.* Borrowing the example from *Berry*, for instance, an expert could not testify that a criminal defendant was guilty (a legal conclusion), even though she could testify that the defendant's fingerprint was the only one on the murder weapon (a fact). *Id.*

With these limitations in mind, Dr. Hynes plainly overstepped by offering opinions on fraud because those are legal conclusions. To start, the term "fraud" is bound up with the governing legal standards in this case. *Melcher*, 672 F. App'x at 552. Even a mere glance at Allstate's allegations confirms this: through its RICO claim, Allstate alleges that Defendants engaged in a pattern of racketeering activity by committing at least two predicate acts of mail and wire *fraud*. ECF No. 17 at PageID.371–74. And both mail and wire fraud require proof of "a scheme or artifice to defraud." *United States v. Turner*, 465 F.3d 667, 680 (6th Cir. 2006) (first citing *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003); and then citing *United States v. Prince*, 214 F.3d 740, 747–48 (6th Cir. 2000)). For this reason, when Dr. Hynes opines that Defendants "committed health care fraud" by "fraudulently submitting" bills to Allstate, he does not just "suggest the answer" to an ultimate issue—he decides it for the jury. *See Berry*, 25 F.3d at 1353. That crosses the line into inadmissible expert opinion. *See id.*

Allstate responds that *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, (6th Cir. 2004), supports admitting Dr. Hynes's opinions on fraud, but that case is distinguishable. There, the district court permitted an expert to testify about a discrete aspect of police practices—the use of excessive force—despite excessive force ultimately being a question for the jury. *Id.* at 908. The Sixth Circuit affirmed, given that the expert had extensive and particularized knowledge about the area:

> [The expert] has a PhD in sociology from Washington State University, is employed by the University of South Carolina's Department of Criminology, teaches classes on police procedures and practices, has been involved with federal research funded by the Department of Justice that evaluates the use of force by officers, trains officers in the use of force, works with police departments to create use-of-force policies, has testified before Congress and state legislatures about police policies, and has authored forty to fifty articles on the subject of police procedures, many of which have appeared in peer-reviewed journals.

*Id.* By contrast, Dr. Hynes has not demonstrated any such particularized knowledge or expertise about medical fraud. Indeed, he states that his opinions on fraud are simply based on generalized training "for Medicare fraud, waste, and abuse," that all medical personnel receive. *See* ECF No. 57-4 at PageID.3947–48 ("I'm saying I have background and training just like every other physician out there has training as to identify fraud, and that's what I identify"). That general training is a far cry from the deep, specialized experience that the expert in *Champion* had.

Accordingly, Dr. Hynes may not offer opinions at trial that label Defendants' conduct as "fraud."

### D. Dr. Hynes's Supplemental Report

Defendants also request that Dr. Hynes's supplemental report be excluded, arguing that he did not prepare it himself. ECF No. 57 at PageID.3594–95.

As background, on September 8, 2023, Allstate served its expert witness list, disclosures, and report for Dr. Hynes, as required by the Court's case management order. *See* ECF Nos. 26; 57-5. Later, on September 26, 2023, Allstate served a supplement to Dr. Hynes's report. ECF No. 57-6. The supplement consists of charts that might be used as exhibits during trial, and which summarize certain findings and opinions contained in Dr. Hynes's initial report. *See id.*; ECF No. 61 at PageID.4489. The supplement states that its contents "do not alter the opinions set forth in [Dr. Hynes's initial report] in any way, are derived entirely from the opinions set forth [in the initial report], and will be used only to summarize the opinions of [the initial report]." ECF No. 57-6 at PageID.4070.

Defendants argue that the supplement is inappropriate under Civil Rule 26(e), which requires parties to supplement discovery disclosures and responses in certain circumstances. ECF No. 57 at PageID.3596. Mainly, they argue that Dr. Hynes did not prepare the supplement or even help prepare it. *Id.* Defendants point to Dr. Hynes's testimony that Allstate provided him with the supplement and that he did

not make any changes, but instead just verified that his opinions within it were correct. ECF No. 57-4 at PageID.3894–95.

True, experts must be the one to "prepare" their report; under Rule 26, they may not simply have it "ghost-written" for them. *Atl. Coast Pipeline, LLC v. 0.07 Acre, More or Less, in Nelson Cnty., Va.*, 396 F. Supp. 3d 628, 636 (W.D. Va. 2019). Even so, counsel may assist with preparing a report, so long as they do not craft the expert's opinions "from whole cloth" and then just have the expert sign at the bottom. *Manning v. Crockett*, No. 95 C 3117, 1999 WL 342715, at *3 (N.D. Ill. May 18, 1999). Thus, provided that an expert personally prepares "the heart" of the report, it will be permissible under Rule 26. *See id.*

Here, despite Defendants' objections, Dr. Hynes clearly prepared "the heart" of the supplement at issue. *See id.* That is because all the supplement's information comes from Dr. Hynes's initial report—which no one disputes he prepared himself. *Compare* ECF No. 57-5, *with* ECF No. 57-6. Put otherwise, the supplement could not exist without Dr. Hynes first generating each of the findings and opinions in his initial report. No matter that Allstate formatted the supplement; by providing all the supplement's underlying findings and opinions, Dr. Hynes helped prepare it. *Manning*, 1999 WL 342715, at *3.

Defendants also argue that the supplement "materially differs" from Dr. Hynes's initial report, based on 3 instances (out the supplement's 575 entries) where

- 17 -

the "date of treatment" listed differs from the date listed in Dr. Hynes's initial report. ECF No. 57 at PageID.3594–95. Although Defendants do not explain how or why such relatively minor inconsistencies are material, they say "Allstate's contradictory positions . . . have made it unreasonably difficult for Defendants to prepare their defense or determine what Allstate claims as its damages." ECF No. 67 at PageID.4834.

This is unpersuasive. Although the supplement requirement was not intended "to allow parties to spring late surprises on their opponents under the guise of a 'supplement to earlier disclosures,'" Allstate has attempted no such thing. *Thomas v. McDowell*, No. 2:10-CV-152, 2014 WL 5305501 (S.D. Ohio Oct. 15, 2014) (quoting *Barlow v. Gen. Motors Corp.*, 595 F.Supp.2d 929, 935–36 (S.D. Ind. 2009)). Dr. Hynes's opinions remained wholly unchanged by the supplement, so it cannot be reasonably characterized as presenting any undue surprises.

Nor is it credible that these minor inconsistencies would substantially mislead or confuse the jury, requiring exclusion under Federal Evidence Rule 403. Indeed, any such inconsistencies between the initial report and the supplement impact weight, not admissibility, and Defendants remain free to further pursue them on cross examination.

Accordingly, the supplement to Dr. Hynes's report will not be excluded.

### E. Patients Not Listed in Allstate's Damages Chart

Finally, Defendants argue that Dr. Hynes may not offer opinions about treatments provided to patients that Allstate did not identify in its "damages" chart (ECF No. 17-4), because those opinions are irrelevant. ECF No. 57 at PageID.3600. Recall that the damages chart lists certain payments Allstate made to Defendants that are at issue in this case.

Rule 702 requires that expert testimony be relevant—that it "will help the trier of fact to understand the evidence or to determine a fact in issue." Put otherwise, "there must be a 'fit' between the inquiry in the case and the testimony, and expert testimony that does not relate to any issue in the case is not relevant and is not helpful." *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1993) (quoting *Daubert*, 509 U.S. at 591).

Here, Dr. Hynes's testimony is relevant to Allstate's RICO claim, even as to those patients not listed in Allstate's damages chart. A RICO claim under 18 U.S.C. § 1962(c) requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

Specifically, Dr. Hynes's opinion on *all* patients is relevant to proving a pattern of racketeering activity by Defendants. "A '*pattern* of racketeering activity' requires related predicate acts of racketeering which continued during a substantial

period or which by their nature forebode of future criminal conduct." *Pik-Coal Co. v. Big Rivers Elec. Corp.*, 200 F.3d 884, 890 n.10 (6th Cir. 2000) (citing *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240–43 (1989)). There is a relationship among predicate acts when they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J., Inc.*, 492 U.S. at 240. Dr. Hynes's testimony about whether Defendants acted similarly across the full range of patients discussed in his expert report goes to this pattern element. Thus, his opinions as to patients not listed in Allstate's damages chart will not be stricken.

## IV. CONCLUSION

Accordingly, it is **ORDERED** that Defendants' Motion to Strike Plaintiffs' Expert Reports and Exclude Expert Testimony, ECF No. 57, is **GRANTED IN PART** and **DENIED IN PART**. It is **GRANTED** to the extent that Allstate's expert, Dr. Hynes, may not offer opinions labeling Defendants' conduct as "fraud" in any way; nor may he offer opinions on the substance of MRIs related to brain injuries. The Motion is **DENIED IN PART** in all other respects.

*/s/Susan K. DeClercq*
SUSAN K. DeCLERCQ
United States District Judge

Dated: January 31, 2025